PER CURIAM.
The Federal Land Policy and Management Act (“FLPMA”) of 1976 § 309, 43 U.S.C. § 1739 (amended 1978), and Bureau *1224 of Land Management (“BLM” or the “agency”) regulations, 43 C.F.R. § 1784.0-1 et seq., require the Secretary of the Interior to create and appoint public members to Resource Advisory Councils (“RACs”). The RACs are designed to be representative of major groups with interests in federal lands, and they make recommendations to the Secretary and the BLM about federal land use policy. This case involves the plaintiffs’ challenge to appointments made by the Secretary in 2001 to the three Colorado RACs. The formation and operation of federal advisory committees like the RACs must conform to requirements established by the Federal Advisory Committee Act (“FACA”), 5 U.S.C. app. 2 § 5. The plaintiffs allege that the Secretary failed to follow the procedural requirements of the FACA and BLM regulations applying to RACs when making the appointments.
The district court dismissed the case, offering two alternative grounds for its action. The district court concluded both that the FACA and the regulations were too vague to provide a meaningful legal standard to adjudicate the plaintiffs’ claims, and that the plaintiffs lacked standing to bring their action. We conclude that the individual plaintiffs Peters and Houdek do have standing to bring this action, and that the “fair membership balance” requirement of 43 C.F.R. § 1784.2-1(a) provides a meaningful legal standard to apply to their claims on that issue. However, we conclude that plaintiffs’ first claim alleging a violation of the letter of reference criteria expressed in 43 C.F.R. § 1784.6-1(e) and plaintiffs’ second claim alleging a violation of the prohibition against inappropriate influence expressed in the FACA, 5 U.S.C. app. 2 § 5(b)(3) do not present meaningful legal standards against which courts can evaluate those claims. Accordingly, those claims do not present justiciable claims. Thus, we REVERSE the district court’s dismissal of count three and AFFIRM the district court’s dismissal of counts one and two. We REMAND for further proceedings on count three as to plaintiffs Peters and Houdek.
BACKGROUND
Among its many provisions relating to federal management of public lands, the FLPMA requires the Secretary of the Interior to establish public advisory councils for the purpose of making recommendations to the Secretary about matters relating to federal land use policy. 43 U.S.C. § 1739(a), (d). Specifically, the Secretary of the Interior is instructed by the statute to
establish advisory councils of not less than ten and not more than fifteen members appointed by him from among persons who are representative of the various major citizens’ interests concerning the problems relating to land use planning or the management of the public lands located within the area for which an advisory council is established.
43 U.S.C. § 1739(a). The advisory councils established by the FLPMA “may furnish advice to the Secretary with respect to land use planning, classification, retention, management, and disposal of the public lands within the area for which the advisory council is established and such other matters as may be referred to it by the Secretary.” 43 U.S.C. § 1739(d).
The formation and operation of the advisory councils authorized by the FLPMA must conform to the requirements of the Federal Advisory Committee Act, 5 U.S.C. app. 2 § 4.[1] See 43 U.S.C. § 1739(a). Ad *1225 visory committees must have a clearly defined purpose, have a membership that is “fairly balanced in terms of the points of view represented and the functions to be performed,” and “not be inappropriately influenced by the appointing authority or by any special interest.” 5 U.S.C. app. 2 § 5(b)(2), (3).
To implement the FLPMA’s directive that the Secretary of the Interior form advisory committees, the Bureau of Land Management promulgated regulations for such committees. See 43 C.F.R. §§ 1784.0-1-1784.6-2. Consistent with the purpose of the FLPMA, the objective of these regulations is to
make available to the Department of the Interior and Bureau of Land Management the expert counsel of concerned, knowledgeable citizens and public officials regarding both the formulation of operating guidelines and the preparation and execution of plans and programs for the use and management of public lands, their natural and cultural resources, and the environment.
43 C.F.R. § 1784.0-2. In addition to establishing general standards for any advisory committee formed to advise the Secretary of the Interior, the regulations specifically create “[rjesource advisory councils ... to cover all lands administered by the Bureau of Land Management.” 43 C.F.R. § 1784.6-1. The appointment of members to the three RACs that cover Colorado is at the core of the dispute in the instant case. The Colorado RACs provide advice and recommendations to the Secretary and the BLM about management of the 8.3 million acres of public lands, and the 27.3 million subsurface acres available for mineral development, in Colorado. The advice and recommendations of the RACs are not binding upon the Secretary or the BLM. See 43 C.F.R. § 1784.5-1 (“The function of an advisory committee is solely advisory. ...”).
The regulations specify that RACs must contain members “representative of the interests of ... 3 general groups.” 43 C.F.R. § 1784.6-l(c). These three groups are (1) people with interests in federal grazing permits, transportation or rights-of-way, outdoor recreation, commercial timber operations, or energy and mineral development; (2) people representing nationally or regionally recognized environmental groups, “dispersed recreational activities,” archeological and historical interests, or nationally or regionally recognized wild horse and burro interest groups; and (3) persons who hold state, county or local elected office, are employed by state natural resources agencies, represent local Indian tribes, are employed as academics in natural resource management or the natural sciences, or represent the affected public-at-large. 43 C.F.R. § 1784.6 — 1(c)(1)—(3). The three RACs in Colorado have fifteen members each, representing the Front Range, the Northwest, and the Southwest regions.
RAC members are chosen by the Secretary of the Interior. Id. at § 1784.6-l(c). The regulations specify that at least one government official must be appointed to each RAC, id., and “the Secretary shall provide for balanced and broad representation from within each [of the three] categories]” specified in the Regulations. Id. at § 1784.6-l(d). In a provision important to this case, the regulations state that: “[a]ll nominations shall be accompanied by letters of reference from interests or organizations to be represented.” Id. at § 1784.6-l(e).
*1226 At issue before us are the nominations and appointments made to the three Colorado RACs by the defendants in 2001. On March 9, 2001, the BLM published in the Federal Register a “Call for Nominations for Resource Advisory Councils.” On the same day, the BLM’s Colorado state office issued a press release publicizing the call for nominations to fill 14 vacancies on the Colorado RACs. An internal BLM policy set the closing date for the nomination process as April 23, 2001, and by that date the BLM had received almost 50 applications, complete with the required letters of reference.
Fifteen days after the close of the nomination period, Colorado Governor Bill Owens submitted to the Colorado Director of the BLM a letter containing a list of 13 nominations to fill the RAC vacancies. The Governor’s letter did not include letters of reference from interest groups supporting the individuals listed, nor did it contain any other documentation in support of the nominees. Of the 13 individuals nominated by Governor Owens, only three later submitted to the BLM letters of reference from the interests they purportedly represent. On September 25, 2001, the Colorado office of the BLM issued a press release announcing that Secretary Norton had filled the 14 vacancies on Colorado’s RACs. All of the 13 nominees listed in Governor Owens’ letter were appointed to RAC positions. Of the approximately 50 public nominees, only one was selected for a RAC position.
Following Secretary Norton’s appointments to the RACs, the plaintiffs filed a complaint in the United States District Court for the District of Colorado seeking declaratory and injunctive relief. The plaintiffs are two Colorado environmental organizations and two individuals who applied for, but did not receive, RAC positions. Their complaint alleges that 10 of the 14 appointments to the RACs were unlawful for three reasons. First, the complaint alleges that the appointments were made without the letters of reference required by 43 C.F.R. § 1784.6-l(e) from the interest or organization each nominee was to represent. Second, the complaint alleges that the appointments resulted from inappropriate influence by Governor Owens, in violation of FACA, 5 U.S.C. app. 2 § 5(b)(3). Third, the complaint alleges that appointments did not satisfy the regulations’ requirement that RAC membership provide balanced representation within each of the three categories of interests that must be represented on the RACs. 43 C.F.R. § 1784.6-l(d).
Shortly after the complaint was filed, the plaintiffs moved for a preliminary injunction, asking the district court to enjoin RAC meetings from taking place with the challenged appointees. The defendants responded to the motion by filing a “Motion to Dismiss Plaintiffs Motion for Preliminary Injunction.”[2] At a hearing on both motions the district court was persuaded by the defendants that the case should be dismissed. The district court ruled
that plaintiffs lack the requisite standing to pursue their cause of action. Most importantly, they have suffered no injury-in-fact at this time. Furthermore, the Federal Advisory Committee Act, 5 U.S.CApp. 2 § 5, and the corresponding regulations in 43 C.F.R. § 1784, are too vague to provide a meaningful standard of review.
Order & J. of Dismissal of May 30, 2002. The court therefore dismissed the complaint.
*1227 The plaintiffs timely filed a notice of appeal and challenged the dismissal of their complaint. They challenge both the district court’s conclusion that the applicable statutes and BLM regulations are too vague to decide the case and that they do not have standing to bring this lawsuit. We have jurisdiction pursuant to 28 U.S.C. § 1291.
DISCUSSION
The defendants moved to dismiss the case under Fed.R.Civ.P. 12(b)(1) and 12(b)(6), but the district court did not specify under which rule it granted the motion to dismiss. Nevertheless, the standard of review is de novo whether we treat the appeal as seeking review of a Rule 12(b)(1) or 12(b)(6) dismissal. See U.S. West, Inc. v. Tristani, 182 F.3d 1202, 1206 (10th Cir.1999) (review of Rule 12(b)(1) dismissal for lack of subject matter jurisdiction is de novo); Sutton v. Utah State Sch. for the Deaf & Blind, 173 F.3d 1226, 1236 (10th Cir.1999) (review of Rule 12(b)(6) dismissal for failure to state a claim is de novo). We choose to treat this appeal as seeking review of a Rule 12(b)(1) dismissal because the two grounds cited by the district court — that the plaintiffs lacked standing and that the statute they sued under does not permit judicial review — are jurisdictional.
I. Existence of a Meaningful Standard of Review
Judicial review of an agency’s compliance with a statute is precluded when the statute is “drawn so that a court would have no meaningful standard against which to judge the agency’s exercise of discretion.” Heckler v. Chaney, 470 U.S. 821, 830, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985). The defendants argued in their motion to dismiss that the statutes and regulations invoked by the plaintiffs fail to provide a meaningful standard for evaluating the RAC appointment decisions. The district court accepted this argument as one of its reasons for dismissing the case, stating its view that “the Federal Advisory Committee Act, 5 U.S.C. app. 2 § 5, and the corresponding regulations in 43 C.F.R. § 1784, are too vague to provide a meaningful standard for review.” We consider this conclusion with respect to each of the three counts in the plaintiffs’ complaint.
A. Count One: Alleged Violation of the Letter-of-Reference Requirement
The first count of the plaintiffs’ complaint alleges that ten of Governor Owens’ nominees were appointed without a requisite letter of reference from the interest or organization they were to represent. 43 C.F.R. § 1784.6-l(e). The plaintiffs claim the failure to abide by its regulation rendered the agency’s appointments “arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law” under the Administrative Procedure Act, (“APA”) 5 U.S.C. § 706(2)(A) & (D). The defendants admit that letters of reference for the Governor’s nominees were not submitted with his recommendations, but letters (which were supplied to the district court and are part of the record on appeal) accompanied the nominations sent to the Secretary for decision. Since the letters of reference were considered by the secretary, they argue, the issue is really one relating to the adequacy of the letters for which the regulation, 43 CFR § 1784.6-1(e), provides no standards and, hence there is no “law to apply,” rendering the issue one committed to agency discretion under Section 701(a)(2) of the APA.
The APA § 701(a) provides an exemption from judicial review for those cases where: “(1) statutes [expressly] preclude judicial review,” 5 U.S.C. § 701(a)(1); “or (2) agency action is committed to agency discretion by law.” 5 U.S.C. § 701(a)(2). *1228 We agree with the defendants, but from a more global perspective.
Exemption from judicial review of agency decisions is narrow. Heckler v. Chaney, 470 U.S. 821, 830, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985). Generally, § 701(a)(2) will be applied when a statute or regulation is “drawn so that a court would have no meaningful standard against which to judge the agency’s exercise of discretion.” Id. In such cases, the statute “can be taken to have ‘committed’ the decisionmaking to the agency’s judgment absolutely.” Id. The exception, however, is not limited to only those cases in which enabling legislation is drawn so broadly there is no law to apply. American Bank, N.A. v. Clarke, 938 F.2d 899, 902 (10th Cir.1991). “Whether and to what extent a particular statute precludes review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history and the nature of the administrative action involved.” Id. (emphasis added) (quoting Block v. Commty. Nutrition Inst., 467 U.S. 340, 345, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984)).
“[A]n administrative agency is not a slave of its rules.” Health Sys. Agency of Okla. v. Norman, 589 F.2d 486, 490 n. 5 (10th Cir.1978) (internal citation and quotations omitted). Although it is axiomatic that duly promulgated rules will have the force and effect of law, not every agency-made “law” is of such a nature that its violation should invalidate agency action. See French v. Edwards, 13 Wall. 506, 80 U.S. 506, 511, 20 L.Ed. 702 (1871). In certain instances, agencies are permitted to waive compliance with their own procedural rules. It is the “nature of the administrative action involved” that provides the foundation for this exception to the reviewability of agency decisions. American Bank, 933 F.2d at 902.
The Supreme Court directly addressed this principle in American Farm Lines v. Black Ball Freight Serv., 397 U.S. 532, 538-39, 90 S.Ct. 1288, 25 L.Ed.2d 547 (1970). There, the Interstate Commerce Commission (“ICC”) granted a motor carrier’s application for temporary operating authority despite the fact that the carrier’s application did not contain certain information required by the ICC’s regulations. Competing motor carriers contended that the ICC was required by its own rules to reject the application. In rejecting the competing carrier’s position, the Court noted the regulation was adopted to facilitate the ICC’s own information gathering and was “not intended primarily to confer important procedural benefits upon individuals .... ” Id. at 538, 90 S.Ct. 1288. The Court relied upon the established principle that:
[I]t is always within the discretion of a court or an administrative agency to relax or modify its procedural rules adopted for the orderly transaction of business before it when in a given case the ends of justice require it. The action of either in such a case is not reviewable except upon a showing of substantial prejudice to the complaining party.
Id. at 539, 90 S.Ct. 1288 (quoting NLRB v. Monsanto Chem. Co., 205 F.2d 763, 764 (8th Cir.1953)).
Thus, Black Ball Freight carves out a limited exception to the general rule that agencies are required to adhere to their own regulations. This limited exception turns on whether the regulations were intended to confer important procedural benefits upon the parties before the agency or whether they are merely procedural rules for the orderly transaction of agency business. Even if it is determined that the regulations are of the latter type, an agency will be required to adhere to its own *1229 regulations where the complaining party will suffer “substantial prejudice” in the absence of such adherence.
With these principles in mind, we turn to the plaintiffs’ allegations in count one of their complaint. The controlling statutes, the FLPMA and FACA, are silent as to the materials, if any, the Secretary must review in deciding whom to appoint to advisory committees. The controlling statutes, therefore, provide no “law to apply” to review the Secretary’s decision regarding the appointment of individuals for the Colorado RACs.
However, the agency’s regulations governing the appointment of RAC members may also be a basis for their claim. The regulation relied on by the plaintiffs states:
In making appointments to resource advisory councils the Secretary shall consider nominations made by the Governor of the State or States affected and nominations received in response to public calls for nominations pursuant to § 1784.4-1. Persons interested in serving on resource advisory councils may nominate themselves. All nominations shall be accompanied by letters of reference from interests or organizations to be represented.
43 C.F.R. § 1786.6 — 1(e).
We must first consider whether this regulation provides “law to apply.” The regulation plainly instructs that all nominations shall include: 1) letters of reference, 2) from interests or organizations to be represented. Assuming this language provides adequate guidance to apply judicial review, our inquiry does not end here.[3]
We must then ask if the regulation proscribes agency action which by its nature is for the benefit of the agency’s orderly transaction of business, or whether it confers a benefit on the plaintiffs. The plaintiffs maintain the “purpose of the reference letter requirement ... is to ensure that the nominees in fact represent the interests they claim to, and that they are qualified to represent them.” (Appellants’ Br. at 18). In essence, the plaintiffs argue the purpose of the requirement is to provide the agency with needed information. It is not uncommon for the “internal procedure” exception enunciated in Black Ball Freight to be applied in situations where the regulation specifies the content of submissions to the agency. See e.g., United States v. Caceres, 440 U.S. 741, 754 n. 18, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979); Central Freight Lines, Inc. v. United States, 669 F.2d 1063, 1070 (5th Cir.1982) (procedural rules designed for processing applications may be relaxed or waived).
Here, the agency’s regulations do not state how the Secretary is to assess the letters of reference or what weight should be given to those letters. They may well establish an applicant’s bona fides as a member of or spokesman for an interest group. On the other hand, they may only *1230 provide a starting place for the Secretary’s background inquiry. The regulations do not limit the Secretary’s information gathering solely to reference letters. In fact, the plaintiffs allege the Governor was contacted about his nominees by the Bureau of Land Management Colorado State Director before she made her recommendation to the Secretary. Thus, additional information regarding the nominees was acquired through at least one avenue. Presumably, unsolicited letters from interest groups would also be considered. Moreover, the quality and legitimacy of the person or organization authoring the letter of reference requires evaluation. At bottom the appointment decision is left to the Secretary’s discretion, subject only to the ultimate result that a “fair balance of membership” be achieved. Therefore, as in Black Ball Freight, the regulation here is not intended to confer important procedural benefits on a party; it is, instead, a procedural aid for the benefit of the agency.[4]
We next inquire whether the plaintiffs were substantially prejudiced by the agency’s acceptance of the Governor’s nominations without an accompanying letter of reference from the interest or organization to be represented. This question is more accurately phrased in this case as whether the acceptance of the nominees’ applications without the letters of reference denied the plaintiffs a fair opportunity to be appointed to a position on the RAC. Only two plaintiffs identified a direct interest in the appointment process, Houdek and Peters. This is not a situation where the Secretary prevented the plaintiffs from submitting relevant information that would promote their candidacies. Rather, their applications comprised two of approximately fifty applications submitted with an accompanying letter of reference. In other words, had the Secretary not accepted the ten nominees who did not have letters of reference from an interest or organization, the remaining nominees would have had one chance in fifty, as opposed to one chance in sixty, for appointment to the RAC. We do not find this difference amounts to substantial prejudice to the applicants who submitted letters of reference. Therefore, the regulation at issue in Count One of plaintiffs’ complaint falls within the exception enunciated in Black Ball Freight, and is not reviewable by the court.
B. Count 2: Alleged Violations of Prohibition Against Inappropriate Influence
The second claim in the plaintiffs’ complaint is that the agency permitted Governor Owens inappropriately to influence the appointment process by allowing him to control a significant number of advisory committee members on the RACs in violation of the FACA, 5 U.S.C. app. 2 § 5(b)(3). As with Count 1, the plaintiffs sued under the APA, arguing that by failing to abide by the requirements of the FACA, the Secretary’s appointments to the RACs were “arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.” 5 U.S.C. § 706(2)(A). The district court dismissed this count because it concluded that 5 U.S.C. app. 2 § 5 was too vague and, therefore, did not provide judicially administrable standards.
*1231 Again, we must apply the Heckler v. Chaney test to determine whether “the statute is drawn so that a court would have no meaningful standard against which to judge the agency’s exercise of discretion.” 470 U.S. at 830, 105 S.Ct. 1649. We conclude that there is no meaningful standard of review provided in the statute and that the district court accordingly did not err in dismissing this count of the complaint.
Section 5(b) of the FACA sets forth a number of requirements relating to the composition and operation of advisory committees:
(b).... Any such legislation [authorizing the establishment of an advisory committee] shall—
(1) contain a clearly defined purpose for the advisory committee;
(2) require the membership of the advisory committee to be fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee;
(3) contain appropriate provisions to assure that the advice and recommendations of the advisory committee tvill not be inappropriately influenced by the appointing authority or by any special interest, but mil instead be the result of the advisory committee’s independent judgment ....
5 U.S.C. app. 2 § 5(b)(l)-(3) (emphasis added). The requirements of § 5(b)(3) are made applicable to agencies by § 5(c), which states: “To the extent they are applicable, the guidelines set out in subsection (b) of this section shall be followed by the President, agency heads, or other Federal officials in creating an advisory committee.” 5 U.S.C. app. 2 § 5(c).
We conclude that § 5(b)(3) does not provide a meaningful standard of review for a court to apply. We are not concerned here with the phrase “appointing authority” because the appointing authority is the Secretary of the Interior and plaintiffs do not allege that the Secretary is inappropriately influencing the RAC’s independent judgment. Instead, plaintiffs argue that Governor Owens is a “special interest” who, by virtue of his sponsorship of such a large group of nominees to these RACs has “inappropriate influence” over the independent judgment of these RACs.
The problem we have with this claim centers on the word “inappropriate.” The very structure of the statute and regulations calls for various special interest groups to recommend candidates for appointment to the RACs that will be giving advice on issues of interest to the recommending entities. It goes without saying that the special interests will recommend nominees who agree with their point of view. That is why the statute and regulations require nominees from a variety of backgrounds — to get different perspectives expressed on the RAC. So, it is not only obvious, but is apparently desired, that the nominees would be aligned with, and hence influenced by, the special interest groups that recommended them. The question is, what does § 5(b)(l)-(3) mean when it prohibits only “inappropriate” influence? Would a call from the recommending entity to a nominee about an issue under consideration constitute “inappropriate” influence? One would doubt it, but the statute does not give us any guidance as to when the line is crossed between appropriate and inappropriate influence. Perhaps bribes or threats from a recommending interest group to its nominee could be regarded as inappropriate influence, but there is no allegation of anything of that nature here and so we do not need to consider those extreme situations.
What is alleged here is simply that Governor Owens will have an inappropriate amount of influence over these RACs by virtue of having nominated or endorsed such a large percentage of the membership of these RACs. But whether Congress in *1232 tended that kind of hypothetical future influence to be inappropriate, and hence illegal under § 5(b)(3), is something as to which we have absolutely no guidance, guidelines or standards from Congress. Thus, we hold that plaintiffs’ claim under § 5(b)(3) is not justiciable. In this regard, we disagree with the Fifth Circuit in Cargill, Inc. v. United States, 173 F.3d 323, 339 n. 30 (5th Cir.1999), which held that claims under § 5(b)(3) were justiciable.
Plaintiffs’ concern about inappropriate influence arising from an interest group sponsoring a disproportionate number of nominees to an RAC should, instead, be addressed under 43 C.F.R. § 1784.2-1(a), which requires a “fair membership balance” in the RAC. That is the substance of plaintiffs’ third claim, and it is that claim to which we now turn.
C. Count 3: Alleged Violations of the Requirement of Fair Membership Balance in Representation
The plaintiffs’ third claim in their complaint is that the agency failed to abide by its regulation requiring that advisory committees have a “fair membership balance.” 43 C.F.R. § 1784.2-l(a). As with Counts 1 and 2, the plaintiffs brought their claim under the APA, 5 U.S.C. § 706(2)(A), and the district court dismissed the count because the regulation was too vague to provide a meaningful standard of review. We conclude that this regulation is justiciable.
Section 1784.2-l(a) states:
Each advisory committee shall be structured to provide fair membership balance, both geographic and interest-specific, in terms of the functions to be performed and points of view to be represented, as prescribed by its charter. Each shall be formed with the objective of providing representative counsel and advice about public land and resource planning, retention, management and disposal.
43 C.F.R. § 1784.2-l(a) (emphasis added). The regulation was promulgated pursuant to FACA, see 43 C.F.R. § 1784.0-3(a), and the emphasized portion closely tracks the language of FACA’s § 5(b)(2), which requires that advisory committees be “fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee.” 5 U.S.C. app. 2 § 5(b)(2). In addition, in a section speaking specifically about the RACs, the BLM regulations say that “[i]n appointing members of a [RAC] from the 3 categories set forth in [§ 1784.6-l(c)(l), (c)(2), and (c)(3) ] ... the Secretary shall provide for balanced and broad representation from within each category.” 43 C.F.R. § 1784.6 — 1(d).
There is no case law addressing the precise question whether the fair balance requirements of 43 C.F.R. §§ 1784.2-l(a) and 1784.6-l(d) are justiciable. However, several courts have addressed the question whether the analogous fair balance provision in 5 U.S.C. app. 2 § 5(b)(2) is justicia-ble. The Fifth and D.C. Circuits have held that the fair balance requirement of § 5(b)(2) is justiciable, and no court of appeals has held to the contrary. See Cargill, 173 F.3d at 335; Public Citizen v. Nat’l Advisory Comm. on Microbiological Criteria for Foods, 886 F.2d 419, 423-25, 433 (D.C.Cir.1989) (majority agreeing that § 5(b)(2) is justiciable). The Eleventh Circuit also has strongly suggested that § 5(b)(2) is justiciable by upholding a district court’s injunction imposed to remedy violations of § 5(b).[5] Alabama-Tombigbee *1233 Rivers Coalition v. Dep’t of Interior, 26 F.3d 1103, 1106-07 (11th Cir.1994). We find these cases to be persuasive authority for the instant case.
We therefore adopt the reasoning of the Fifth and D.C. Circuits and apply it to the fair balance requirement of 43 C.F.R. §§ 1784.2-l(a) and 1784.6-l(d). The BLM regulations are not “[one of] those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply.” Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (internal quotation marks omitted). As Judge Edwards wrote in Microbiological Criteria:
It does not matter that the “fairly balanced” requirement falls short of mathematical precision in application, or that it may involve some balancing of interests by the agency. The presumption in favor of judicial review is not altered in the face of a diffuse statutory directive. Indeed, this [is] one of the principal points of the Supreme Court’s decision in Overton Park In that case, the Court allowed a suit under a statute that prohibited the Secretary of Transportation from authorizing the use of federal funds to finance the construction of highways through public parks if a “feasible and prudent” alternative route exists and allowed construction through parks only if there has been “all possible planning to minimize harm” to the park. Overton Park, 401 U.S. at 411, 91 S.Ct. 814.... The “feasible and prudent” and “minimize harm” standards involved a significant and ill-defined weighing of interests by the agency, just as does the “fairly balanced” standard in this case. However, as the Court made clear, this did not mean that there was “no law to apply.” Id. at 410-13, 91 S.Ct. 814.... While the difficulty of determining what precisely constitutes a “fair balance” may incline courts to be deferential in reviewing the composition of advisory committees and may defeat a plaintiffs claims in a given case, this cannot be grounds for refusing to enforce the provision altogether.
Microbiological Criteria, 886 F.2d at 434 (Edwards, J., concurring in part and dissenting in part).
Compared to the statutes at issue in Overton Park and Microbiological Criteria, which provided “law to apply” even though they required “ill-defined weighing of interests,” the BLM regulations provide a more precise standard for determining what constitutes a fair balance of interests on the RACs. Section 1784.6-l(c) requires that appointees to RACs be representative of three general groups, each of which is comprised of specific subgroups: (1) people with interests in federal grazing permits, transportation or rights-of-way, outdoor recreation, commercial timber operations, or energy and mineral development; (2) people representing nationally or regionally recognized environmental groups, “dispersed recreational activities,” archeological and historical interests, or wild horse and burro interest groups; and (3) persons who hold state, county or local elected office, are employed by state natural resources agencies, represent local Indian tribes, are employed as academics in natural resource management or the natural sciences, or represent the public-at-large. 43 C.F.R. § 1784.6-l(c)(l)-(3). The regulations state that “the Secretary shall provide for balanced and broad representation from within each category” of interests described in § 1784.6-l(c). 43 C.F.R. § 1784.6-l(d). Thus, whereas under § 5(b)(2) a court must determine what interests should be represented in light of the purpose and functions of the advisory committee before deciding whether those interests are fairly represented, see Car-gill, 173 F.3d at 336, 337, under § 1784.6-1(c) the court knows which categories of *1234 interests are entitled to representation on the RACs.
In fact, the BLM regulations do more than simply list the interest groups that are to be represented on the RACs. The regulations require that RACs be organized consistent with one of three models described in 43 C.F.R. § 1784.6-2. The three models differ in terms of what jurisdiction the RAC covers, what constitutes a quorum for conducting RAC business, and what subgroups may be formed to work under the RAC. See 43 C.F.R. § 1784.6-2(a)(1), (a)(2), and (a)(3). Most relevant for our purposes, however, is how this section specifies the membership requirements for each model RAC. Under Model A, “[e]ach council shall have 15 members, distributed equally among the 3 interest groups specified in § 1784.6-l(e).” 43 C.F.R. § 1784.6 — 2(a)(l)(ii). Model B is more precise, consisting of “15 members, distributed equally among the 3 interest groups specified in § 1784.6-l(c), and will include at least one representative from wildlife interest groups, grazing interests, minerals and energy interests, and established environmental/conservation interests, The Governor [of the covered state] shall chair the council.” 43 C.F.R. § 1784.6-2(a)(2)(ii). Model C states that “[mjembership of the council shall be 10 to 15 members, distributed in a balanced fashion among the 3 interest groups defined in § 1784.6-l(c).” 43 C.F.R. § 1784.6 — 2(a)(3)(ii). In requiring equal representation of the three groups defined in § 1784.6-l(c), Models A and B require that five members of the fifteen-member RAC be drawn from each interest group. Model C requires “balanced” representation from among the three interest groups because RACs under the model may have 10,11,13, or 14 members, sizes that do not permit equal representations from among the three groups. Still, balanced representation under Model C at least requires that none of the interest groups be significantly over-represented compared to the others.
For the foregoing reasons, we hold that the “fair balance” requirement of 43 C.F.R. §§ 1784.2-l(a) and 1784.6-l(d) is justiciable and the district court erred in dismissing Count 3 of the complaint.
II. Standing
Having concluded that 43 C.F.R. §§ 1784.2-l(a) and 1784.6-l(d) provides a justiciable legal standard, we now consider whether the plaintiffs have standing to raise that claim. We review questions of standing de novo. Catron County Bd. of Comm’rs v. United States Fish & Wildlife Serv., 75 F.3d 1429, 1433 (10th Cir.1996).
Article III of the Constitution limits the exercise of judicial power to “Cases” and “Controversies,” and the core doctrine of standing “is an essential and unchanging part of the ease-or-controversy requirement of Article III.” Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). A plaintiff must establish three elements to satisfy the minimum constitutional requirements of standing. First, the plaintiff must have experienced an “injury in fact,” that is, an invasion of a legally protected interest that is “concrete and particularized” and “actual or imminent.” Id. Second, “there must be a causal connection between the injury and the conduct complained of.” Id. Third, it must be likely, not speculative, that the injury will be redressed by the trial court’s favorable decision. Id. at 561, 112 S.Ct. 2130. The plaintiffs have the burden of alleging facts establishing these three elements. See Utah v. Babbitt, 137 F.3d 1193, 1202 (10th Cir.1998).
Because neither the FLPMA nor the FACA contains a private right of ac *1235 tion for those seeking to enforce the procedural requirements attending the creation and operation of federal advisory committees, the plaintiffs rely upon the judicial review provisions of the Administrative Procedure Act as the basis for their district court action.[6] “Consequently, in addition to the Article III standing requirements, Plaintiffs must also meet the statutory standing requirements of the APA: Plaintiffs must show there has been some final agency action and must demonstrate that [their] claims fall within the zone of interests protected by the statute forming the basis of [their] claims.” Babbitt, 137 F.3d at 1203 (internal footnote and quotation marks omitted) (alterations in original); Committee to Save the Rio Hondo v. Lucero, 102 F.3d 445, 448 (10th Cir.1996).
We find standing here based on the individual plaintiffs’ claim of an interest in a fair opportunity to be appointed to an RAC which opportunity was denied them when the Secretary of the Interior short-circuited the “fair balance” requirement.
Sarah Peters and Joshua Houdek assert damage to their personal interests in a right to a fair chance to be appointed to an RAC. See the Appellant Brief at p. 42 (“Like a contractor who discovered, after not being awarded the contract, that the process was rigged and the contract winner had not even submitted a proper bid, [the plaintiffs] suffered concrete and actual harm in that the process they participated in was tainted.”).
Standing predicated upon denial of a fair opportunity to compete for a position or contract is well established in the law. In Regents of University of California v. Bakke, 438 U.S. 265, 281 n. 14, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), the Supreme Court concluded that Bakke had standing to complain that the affirmative action program at the University of California deprived him of a fair opportunity for admission to the medical school even though he had not clearly established that he would have been selected in the absence of the challenged affirmative action program. The Supreme Court concluded:
[E]ven if Bakke had been unable to prove that he would have been admitted in the absence of the special program, it would not follow that he lacked standing. The constitutional element of standing is plaintiffs demonstration of any injury to himself that is likely to be redressed by favorable decision of his claim. The trial court found such an injury, apart from failure to be admitted, in the University’s decision not to permit Bakke to compete for all 100 places in the class, simply because of his race. Hence the constitutional requirements of Art. Ill were met. The question of Bakke’s admission vel non is merely one of relief.
Id. (emphasis added; citations omitted).
Following Bakke, the Supreme Court again had the opportunity to consider the issue of standing in the context of an allegation of loss of opportunity to compete in the case of Northeastern Florida Chapter of the Associated General Contractors of America v. City of Jacksonville, 508 U.S. 656, 664-66, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993). In Northeastern Florida Contractors, the Supreme Court held that a non-minority contractor had standing to complain about an affirmative action provision that set aside ten percent of the amount spent on City contracts for minority contractors. The court concluded that a non-minority contractor had alleged a sufficient injury for standing in that the set aside deprived that contractor of an oppor *1236 tunity to compete for that portion of the City’s business that was set aside for minority contractors. The Court concluded:
When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing.
Id. at 666, 113 S.Ct. 2297; see also Turner v. Fouche, 396 U.S. 346, 362, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970) (“We may assume that the [plaintiffs] have no right to be appointed to the ... board of education. But [they] do have a federal constitutional right to be considered for public service without the burden of invidiously discriminatory disqualifications” (footnote omitted).) Cf. Clements v. Fashing, 457 U.S. 957, 962, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982) (Office holders stated a justiciable claim challenging a provision of the Texas constitution which required immediate resignation from office before the officer holder could run for another office even though the plaintiffs had not establishéd that they had, in fact, announced their candidacy for another office.).
We reached the same conclusion in Clajon Production Corp. v. Petera, 70 F.3d 1566, 1572-74 (10th Cir.1995). There we held that a landowner would have standing to challenge a state hunting license provision which arguably disadvantaged the landowner’s opportunity to attract out-of-state hunters, but the claim in that particular case ultimately failed because of a failure to present evidence of the mechanism by which the plaintiffs opportunity to attract out-of-state hunters was diminished.
At the preliminary pleading stage, which is the stage of this matter as presented on appeal, Peters and Houdek have alleged that their opportunities for appointment to the relevant RACs were diminished by the inappropriate dominance of the nomination process by one interest group — Governor Owens representing the State of Colorado. It is a fair inference from their allegations that if the “fair membership balance” provision of 42 C.F.R. §§ 1784.6-l(d) and 1784.2-(l)(a) had been observed, more positions on the RACs would have been available to be filled by interest groups such as the ones that recommended them.
At this stage in the proceedings, we do not address whether Peters and Houdek ultimately can prove injury sufficiently to establish standing. However, we believe at the pleadings stage that there is enough to allow this matter to proceed on their behalf.
Because we believe that this standing interest in a fair opportunity to be appointed to an RAC is unique to Peters and Houdek, we do not extend it to the Colorado Environmental Coalition or the Colorado Mountain Club. The positions sought on the relevant RACs were to be held by individuals, not organizations. In fact, as noted in our discussion of the justiciability of a claim under 5 U.S.C. app. 2 § 5(b)(3), the special interest recommending individuals are precluded from having an “inappropriate influence” over the individuals nominated. Thus, this particular theory of standing is availing only to Peters and Houdek.
CONCLUSION
We conclude that 43 C.F.R. § 1784.6-1(e) (letters of reference requirement) and 5 U.S.C. app. 2 § 5(b)(3) (prohibition against inappropriate influence by special interests) do not provide meaningful standards by which plaintiffs’ claims may be evaluated and hence plaintiffs’ claims relying on those provisions are not justiciable. Accordingly, we AFFIRM the district *1237 court’s dismissal of those claims in counts one and two. However, we conclude that the “fair membership balance” provision of 43 C.F.R. §§ 1784.2-1(a) and 1784.6-l(d) does provide an adequate standard to permit judicial review and a claim under that provision is justiciable. Hence we REVERSE the district court’s dismissal of count three. We conclude that Peters and Houdek, but not the institutional plaintiffs, have standing to assert the claim in count three (alleging a violation of the “fair membership balance” provision of 43 C.F.R. §§ 1784.2-l(a) and 1784.6-l(d)). We REMAND this matter to the district court for further proceedings on count three as to plaintiffs Peters and Houdek.

. Although FACA speaks of advisory ''committees’' and the entities at issue in this case are ''councils,” such councils are clearly intended to be covered by the Act. See 5 U.S.C. app. 2 § 3 (defining "advisory committee” to include "any committee, board, commission, council, *1225 conference, panel, task force, or other similar group ... which is ... established by statute ... in the interest of obtaining advice or recommendations for ... one or more agencies. ..

. Despite how the defendants styled their motion, it was clearly intended to be, and in fact was treated by the court as, a motion to dismiss the case.

. Plaintiffs allege the term "shall” in the regulation not only provides a meaningful standard for judicial review, but makes compliance mandatory. While such language indicates required action, it is not dispositive. In French, the Supreme Court considered a statute stating the sheriff "shall” take certain actions in a tax sale of property. 80 U.S. at 511-12, 20 L.Ed. 702. Nonetheless, the Court stated:
There are undoubtedly many statutory requisitions intended for the guide of officers in the conduct of business devolved upon them, which do not limit their power or render its exercise in disregard of the requisitions ineffectual. Such generally are regulations designed to secure order, system, and dispatch in proceedings, and by a disregard of which the rights of parties interested cannot be injuriously affected. Provisions of this character are not usually regarded as mandatory unless accompanied by negative words importing that the acts required shall not be done in any other manner or time than that designated.
Id. at 511, 20 L.Ed. 702.

. Even if we were to construe the regulatory language requiring letters of reference to somehow bestow benefits on the applicant pool another mandatory requirement of the same section would come into play. The regulations provide: "CT]he Secretary shall consider nominations made by the Governor. ...” 43 C.F.R. § 1784.6-l(e). Somehow the procedural requirement for letters of reference would have to accommodate the positive command to consider the Governor's nominations.

. In Alabama-Tombigbee, the Eleventh Circuit reviewed whether a district court could issue an injunction to remedy violations of § 5(b). 26 F.3d at 1104. The court listed the § 5 provisions, but it did not specify which of them the district court concluded had been violated. See id. at 1106-07.

. Section 10(a) of the APA provides: "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.” 5 U.S.C. § 702.