# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued September 15, 2014      Decided December 19, 2014

No. 13-7081

ALAN J. BAUER, DR.,
APPELLANT

v.

MAVI MARMARA, AND ALL RIGHT, TITLE AND INTEREST
THEREIN, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:11-cv-01267)

*Asher Perlin* argued the cause and filed the briefs for appellant.

*Vijay Shanker*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief was *Mythili Raman*, Acting Assistant Attorney General.

Before: SRINIVASAN, *Circuit Judge*, EDWARDS, *Senior Circuit Judge*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

2

EDWARDS, *Senior Circuit Judge*: The Neutrality Act ("Act"), 18 U.S.C. § 962, was initially passed in 1794. It "has been generally recognized as the first instance of municipal legislation in support of the obligations of neutrality, and a remarkable advance in the development of International Law." *The Three Friends*, 166 U.S. 1, 52 (1897). The Act makes it unlawful to furnish, fit out, or arm a vessel within the United States with the intent of having the vessel used in the service of a foreign state or people to commit hostilities against another foreign state or people with whom the United States is at peace. Any person who violates the Act "[s]hall be fined . . . or imprisoned not more than three years, or both." 18 U.S.C. § 962. In addition, vessels that are covered by the Act are subject to forfeiture, and persons who give information leading to the seizure of such vessels may recover a bounty, with "one half to the use of the informer and the other half to the use of the United States." *Id.*

On July 11, 2011, appellant, Dr. Alan J. Bauer, filed a complaint in the District Court to pursue a claim under the Neutrality Act. The complaint asserted that Dr. Bauer had informed the United States Government of vessels that had been funded, furnished, and fitted by anti-Israel organizations in the United States, together with violent and militant anti-Israel organizations from other countries, in violation of the Act. The complaint further averred that the vessels were to be employed in the service of Hamas, a terrorist organization in the Gaza Strip, to commit hostilities against Israel. Dr. Bauer claimed that he had the right, as an informer, to condemn the vessels for forfeiture and to share in the bounty.

The District Court dismissed the complaint, on the ground that:

18 U.S.C. § 962 lacks an express private cause of action, and the court declines the plaintiff's invitation to imply one. Accordingly, this case must be dismissed for the plaintiff's failure to state a claim upon which relief may be granted.

*Bauer v. Mavi Marmara*, 942 F. Supp. 2d 31, 43 (D.D.C. 2013). In its brief to this court, the United States ("Government"), appearing as an interested party, agrees that "[a] private individual has no authority to bring an action under Section 962." United States Br. 10. "Moreover," according to the Government, "even assuming a private party can bring a forfeiture action under the statute, the government's participation would be required, and the government here declines to participate in Dr. Bauer's suit." *Id*. During oral argument before this court, Government counsel also argued that Dr. Bauer's suit should be dismissed for lack of standing.

Dr. Bauer concedes that the Neutrality Act does not provide an express cause of action. He insists, however, that a private cause of action may be judicially implied. In support of this position, Dr. Bauer contends that statutes that contain a bounty provision and that do not forbid a private cause of action should be understood to implicitly grant a private cause of action to informers. In his briefs to this court, Dr. Bauer does not directly address standing. He seems to assume that if a party has a private cause of action to sue, he necessarily has standing.

It is well understood that a party who seeks to pursue an action in federal court must first establish Article III standing. As the Supreme Court explained in *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992):

> [T]he irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Id.* at 560–61 (citations, internal quotation marks, and alterations omitted).

We recognize that when a plaintiff's alleged injury arises solely from a statute, questions concerning standing and the availability of a private cause of action under the statute may be intertwined. Nevertheless, standing and a failure to state a cause of action are not the same.

The question whether a federal statute creates a claim for relief is not jurisdictional. *Nw. Airlines, Inc. v. Cnty. of Kent, Mich.*, 510 U.S. 355, 365 (1994). Therefore, an objection to a party's failure to state a claim upon which relief can be granted can be forfeited if it is not properly raised. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 507 (2006). On the other hand, standing is jurisdictional and it can never be forfeited or waived. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998). "Standing can be raised at any point in a case proceeding and, as a jurisdictional matter, may be raised, *sua sponte*, by the court." *Steffan v. Perry*, 41 F.3d 677, 697 n.20 (D.C. Cir. 1994) (en banc). And "[w]hen there is doubt about

a party's constitutional standing, the court *must* resolve the doubt, *sua sponte* if need be." *Lee's Summit, Mo. v. Surface Transp. Bd.*, 231 F.3d 39, 41 (D.C. Cir. 2000) (first emphasis added). Given this mandate, we have carefully focused on the requirements of Article III and concluded that Dr. Bauer's suit must be dismissed for want of standing, not for failure to state a cause of action.

Our decision here is informed by the Supreme Court's decision in *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765 (2000). In *Stevens*, the Court held that bounty hunters like Dr. Bauer have standing to sue only through "the doctrine that the assignee of a claim has standing to assert the injury in fact suffered by the assignor." *Id.* at 773. That case concerned the False Claims Act, 31 U.S.C. §§ 3729–3733, which expressly authorizes private parties who are aware of fraud against the Government to sue on behalf of the Government and collect restitution and penalties from the fraudsters, keeping part of the recovery for themselves. *Id.* § 3730(b)(1). The *Stevens* Court found that

> the statute gives the relator himself an interest *in the lawsuit*, and not merely the right to retain a fee out of the recovery. Thus, it provides that "[a] person may bring a civil action for a violation of section 3729 *for the person and for the United States Government*," § 3730(b) (emphasis added); gives the relator "the right to continue as a party to the action" even when the Government itself has assumed "primary responsibility" for prosecuting it, § 3730(c)(1); entitles the relator to a hearing before the Government's voluntary dismissal of the suit, § 3730(c)(2)(A); and prohibits the Government from settling the suit over the relator's objection without a judicial determination of "fair[ness], adequa[cy] and reasonable[ness]," § 3730(c)(2)(B).

*Stevens*, 529 U.S. at 772. In light of these statutory provisions, the Court held that the False Claims Act "can reasonably be regarded as effecting a partial assignment of the Government's damages claim." *Id*. at 773. It reached this conclusion in part because the False Claims Act "gives the relator himself an interest *in the lawsuit*, and not merely the right to retain a fee out of the recovery." *Id*. at 772.

There is no such assignment under the Neutrality Act. An informer under the Neutrality Act has nothing more than an inchoate and conditional interest in a bounty, which hinges on whether the Government pursues a forfeiture action. Therefore, an informer like Dr. Bauer cannot establish either injury-in-fact or redressability and has no standing to pursue this action on his own to enforce the Government's interests in neutrality in foreign affairs.

## I. BACKGROUND

### A. *The Neutrality Act*

Congress passed the Neutrality Act in 1794. Act of June 5, 1794, ch. 50, 1 Stat. 381. The Act

> was recommended to congress by President Washington in his annual address on December 3, 1793, was drawn by Hamilton, and passed the senate by the casting vote of Vice President Adams. [It] was designed to keep the United States from getting dragged into the conflict between England and France. Thomas H. Lee, *The Safe-Conduct Theory of the Alien Tort Statute*, 106 COLUM. L. REV. 830, 847 (2006) (describing the "young Republic's neutrality crisis" as the Founders precariously navigated "between the Scylla of Britain and the Charybdis of

France."). Thus, the Act appears to be a legislative enactment of President Washington's warning – made famous in his farewell address – that the young nation should remain free from entangling alliances. George Washington, Farewell Address (Sept. 19, 1796), *reprinted in* S. Doc. No. 106-21 (2000).

*Bauer*, 942 F. Supp. 2d at 33 (citation and internal quotation marks omitted); *see also The Three Friends*, 166 U.S. at 52–53.

As noted above, the Act criminalizes certain actions committed in the United States that support a foreign state or people against any other foreign state or people with whom the United States is at peace. Though repeatedly amended, and very rarely invoked, much of the original Act remains in force to this day.

The section of the Neutrality Act at issue in this case states:

Whoever, within the United States, furnishes, fits out, arms, or attempts to furnish, fit out or arm, any vessel, with intent that such vessel shall be employed in the service of any foreign prince, or state, or of any colony, district, or people, to cruise, or commit hostilities against the subjects, citizens, or property of any foreign prince or state, or of any colony, district, or people with whom the United States is at peace; . . . [s]hall be fined under this title or imprisoned not more than three years, or both.

18 U.S.C. § 962. The Act further provides that

Every such vessel, her tackle, apparel, and furniture, together with all materials, arms, ammunition, and stores

which may have been procured for the building and equipment thereof, shall be forfeited, one half to the use of the informer and the other half to the use of the United States.

*Id.*

Bounty statutes such as the Neutrality Act were popular immediately after the ratification of the Constitution.

> Although there is no evidence that the Colonies allowed common-law *qui tam* actions (which . . . were dying out in England by that time), they did pass several informer statutes expressly authorizing *qui tam* suits. Moreover, immediately after the framing, the First Congress enacted a considerable number of informer statutes. Like their English counterparts, some of them provided both a bounty and an express cause of action; others provided a bounty only.

*Stevens*, 529 U.S. at 776–77 (citation and footnotes omitted). The Neutrality Act was a "bounty only" statute. As we explain below, no judicial decision of which we are aware has ever construed the Neutrality Act to afford standing to a private party to prosecute an alleged criminal infraction or to independently pursue a forfeiture claim.

## B. *The Gaza Flotilla and Dr. Bauer's Lawsuit*

According to Dr. Bauer's complaint, his lawsuit arises from the 2007 rise to power of Hamas, a terrorist organization in the Gaza Strip. After Hamas seized power in Gaza and began carrying out systematic rocket and missile attacks against civilian targets in Israel, Israel imposed a maritime

blockade to limit Hamas's ability to receive material support that would facilitate the attacks.

Dr. Bauer alleges that, in response to the blockade, anti-Israel organizations in the United States, together with violent and militant anti-Israel organizations from other countries, initiated efforts to breach Israel's blockade, to harm Israeli security, and to support the Hamas-controlled government in the Gaza Strip. These groups allegedly raised money within the United States and through U.S. bank accounts, which they used to "furnish[] and fit[] out and attempt[] to furnish and fit out the Defendant Vessels, with the intent that the Defendant Vessels be employed in the service of a colony, district, or people [Hamas-controlled Gaza], to cruise and commit hostilities against" Israel, "with whom the United States is at peace." Compl. ¶ 18, *reprinted in* App. 6.

On June 13, 2011, Dr. Bauer sent a letter to Attorney General Eric Holder, identifying the alleged violation of the Neutrality Act and providing the names of 14 vessels that were involved. On July 11, he filed a complaint in the District Court, setting out the allegations above and requesting that the court commence forfeiture proceedings against the vessels.

On its own motion, the District Court issued an order to show cause why Dr. Bauer's complaint should not be dismissed for lack of standing. The court also requested, pursuant to 28 U.S.C. § 517, that the Department of Justice file a statement of interest on standing in the case. After receiving submissions from Dr. Bauer and the Government, the District Court dismissed the complaint on the ground that the Neutrality Act did not authorize a private suit for forfeiture and, therefore, Dr. Bauer had failed to state a claim on which relief could be granted. *Bauer*, 942 F. Supp. 2d at 43. Dr. Bauer now appeals.

## II. ANALYSIS

### A. *Introduction – The Critical Threshold Requirement of Article III Standing*

The District Court and the parties have focused on the question whether Dr. Bauer's complaint states a cause of action. To assess the case in these terms is to assume that Dr. Bauer has standing, which is a threshold jurisdictional requirement. We do not accept this assumption. As the Court noted in *Bender v. Williamsport Area School District*, 475 U.S. 534 (1986):

> Federal courts are not courts of general jurisdiction; they have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto. For that reason, every federal appellate court has a special obligation to satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review, even though the parties are prepared to concede it. And if the record discloses that the lower court was without jurisdiction this court will notice the defect, although the parties make no contention concerning it. When the lower federal court lacks jurisdiction, we have jurisdiction on appeal, not of the merits but merely for the purpose of correcting the error of the lower court in entertaining the suit.

*Id.* at 541 (citations, internal quotation marks, and brackets omitted). Under Article III, a party who invokes the court's authority "must have suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (citations and internal

quotation marks omitted). And "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 561 (internal quotation marks omitted). In this case, Dr. Bauer has failed to show that he has suffered or been assigned any injury in fact, and he cannot show that his alleged injury will be redressed by a favorable action of the court. Therefore, we are obliged to dismiss his complaint because we have no jurisdiction to hear it.

Critical to this holding is our finding that a person who claims to be an informer under the Neutrality Act has nothing more than an inchoate and conditional interest in collecting a bounty, which does not ripen unless the Government seeks forfeiture of the vessels identified by the purported informer. By default, a member of the public has no more legal interest in forfeiting property associated with a crime than with prosecuting the crime itself. It is therefore hardly surprising that under the Neutrality Act, as with most criminal statutes, the Government alone determines whether to prosecute offenders. *See Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) (holding that "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another"). Dr. Bauer does not dispute this. Similarly, although the Act also authorizes a civil action for forfeiture, it does not afford standing to purported informers to pursue forfeiture on their own. An informer like Dr. Bauer can point to no concrete injury. An inchoate, conditional interest in a bounty is not enough to demonstrate injury in support of standing.

Dr. Bauer is also unable to satisfy the redressability prong of Article III standing because the court cannot compel the Government to pursue action to seek forfeiture of the disputed vessels. Without such action by the Government, Dr. Bauer has nothing to claim under the Neutrality Act. An informer may be disappointed if the Government declines to

pursue forfeiture, but disappointment of this sort is a far cry from the injury and redressability required to prove Article III standing. *See*, *e.g.*, *Miami Bldg. & Constr. Trades Council v. Sec'y of Def.*, 493 F.3d 201, 202, 205–06 (D.C. Cir. 2007) (holding that "disappointment" at a "lost opportunity" is not enough for standing where the possibility for redress rests in the discretion of a third party who has declined to take action necessary to serve the plaintiff's interests); *see also Lujan*, 504 U.S. at 562 (no standing if an element of standing "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict" (citation and internal quotation marks omitted)).

In the analysis below, we show that the language, purpose, and historical context of the Neutrality Act support our finding that informers have no standing to sue for forfeiture on their own.

**B.** ***The Language and Purpose of the Neutrality Act Show That Private Parties Do Not Have Standing to Pursue Forfeiture on Their Own Under the Neutrality Act***

"It is settled law that an informer can in no case sue in his own name to recover a forfeiture given in part to him, unless the right to sue is accorded by the statute raising the forfeiture. That is why the terms and structure of the particular statute are decisive." *Conn. Action Now, Inc. v. Roberts Plating Co.*, 457 F.2d 81, 84 (2d Cir. 1972) (citation and internal quotation marks omitted). Focusing on the terms and structure of a statute also ensures fealty to the proper judicial role: "Raising up causes of action where a statute has not created them may be a proper function for common-law courts, but not for federal tribunals." *Alexander v. Sandoval*,

532 U.S. 275, 287 (2001) (citation and internal quotation marks omitted).

The Neutrality Act was one of many bounty statutes passed in the early days of the Republic, and many of those statutes explicitly authorized informers to sue. The express inclusion in some statutes of language granting private parties a right to sue certainly suggests that Congress did not intend for such a right to be implied in the absence of express authorization.

For example, a few months before the Neutrality Act was passed, Congress enacted the Slave Trade Act of 1794, which made it illegal to "build, fit, equip, load or otherwise prepare any ship or vessel" within the United States for the purpose of carrying on the slave trade. Act of Mar. 22, 1794, ch. 11, § 1–2, 1 Stat. 347, 347–48. The Slave Trade Act was passed by the same Congress that passed the Neutrality Act, yet the terms of the statutes are very different with respect to whether a private party has standing to pursue a claim. The Slave Trade Act provided, explicitly, that the bounty went to "the use of him or her *who shall sue for and prosecute*." *Id.* § 2, 1 Stat. at 349 (emphasis added). When Congress passed the Neutrality Act several months later, it did not include any language of this sort. Many other bounty statutes from this era, unlike the Neutrality Act, also explicitly afforded private parties a right to sue to claim bounties allegedly owed to them. *See Stevens*, 529 U.S. at 777 n.6 (collecting examples). The Neutrality Act stands out because of what it does not say.

The absence of any provision in the Neutrality Act affording standing to private parties to pursue actions for forfeiture on their own is unsurprising in light of the Government's primacy in the management of international affairs. *See United States v. Curtiss-Wright Export Corp.*, 299

U.S. 304, 320 (1936); *Olivier v. Hyland*, 186 F. 843, 843 (5th Cir. 1911) (per curiam) ("The enforcement of the neutrality laws of the United States is of necessity under the control of the government of the United States . . . ."). As the Supreme Court has reminded us, courts must be "particularly wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs" because of the "potential implications for the foreign relations of the United States." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 727 (2004). And as this court has previously noted in the context of a separate provision of the Neutrality Act (albeit one without a bounty provision), it would "be doubly difficult to find a private damage action within the Neutrality Act, since this would have the practical effect of eliminating prosecutorial discretion in an area where the normal desirability of such discretion is vastly augmented by the broad leeway traditionally accorded the Executive in matters of foreign affairs." *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 210 (D.C. Cir. 1985) (Scalia, J.) (citation omitted); *see also Smith v. Reagan*, 844 F.2d 195, 201 (4th Cir. 1988) (courts should be wary of "tread[ing] on matters of foreign policy which have long been recognized as the exclusive province of the political branches," and courts "must be especially certain of congressional intent before inferring a private cause of action" in the realm of foreign affairs).

In sum, there is nothing in the language or purpose of the Neutrality Act that supports Dr. Bauer's position in this case.

**C.** ***There Is No Case in Which the Supreme Court or Any Federal Appellate Court Has Held That Private Parties Have Standing to Pursue Forfeiture on Their Own Under the Neutrality Act***

Dr. Bauer claims that, despite the absence of any language in the statute to support his standing to pursue a forfeiture action, the Neutrality Act always has been understood to endorse private causes of action by purported informers. This, according to Dr. Bauer, confirms his standing in this case. We can find no creditable evidence to support this view.

Dr. Bauer has not cited a single decision issued by the Supreme Court or any federal appellate court in which a private party has been allowed to prosecute either a criminal action or a forfeiture pursuant to the Neutrality Act. Indeed, historical practice has been manifestly to the contrary. Because "private citizen[s] lack[] a judicially cognizable interest in the prosecution or nonprosecution of another," *Linda R.S.*, 410 U.S. at 619, criminal actions under the Neutrality Act have been pursued only by Government prosecutors. *See, e.g.*, *United States v. Quincy*, 31 U.S. 445 (1832) (Government criminal prosecution for violations of the Neutrality Act); *United States v. Reyburn*, 31 U.S. 352 (1832) (same); *United States v. Trumbull*, 48 F. 99 (S.D. Cal. 1891) (same). Neutrality Act forfeitures have likewise been pursued only by Government officials. *See, e.g.*, *The Three Friends*, 166 U.S. 1 (seizure and forfeiture by the Government); *Gelston v. Hoyt*, 16 U.S. 246, 320 (1818) (noting that only a Government official has the "authority to make the seizure, or to enforce the forfeiture"); *The Laurada*, 98 F. 983 (3d Cir. 1900), *affirming The Laurada*, 85 F. 760 (D. Del. 1898) (action filed on behalf of the United States praying that vessel be condemned and declared forfeited for an alleged violation

of the Neutrality Act); *The City of Mexico*, 28 F. 148 (S.D. Fla. 1886) (decree of forfeiture issued in favor of the Government).

As the court held in *Olivier*:

> The enforcement of the neutrality laws of the United States is of necessity under the control of the government of the United States. Where a seizure is made on complaint of an informer for violation of [the Neutrality Act], and the United States, through its proper representatives, intervenes, disavows, and declines to ratify the seizure, as in the instant case, the informer can have no such inchoate or other interest as will permit the further prosecution of the case in his behalf.

186 F. at 843.

In an effort to overcome the overwhelming weight of authority against him, Dr. Bauer points to dictum in a footnote in the Supreme Court's decision in *United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943). The footnote describes *qui tam* actions generally, and then states that "[s]tatutes providing for a reward to informers which do not specifically either authorize or forbid the informer to institute the action are construed to authorize him to sue." *Id.* at 541 n.4 (citing *Adams v. Woods*, 6 U.S. (2 Cranch) 336 (1805)). This dictum has never been applied or otherwise followed by the Supreme Court or any federal appellate court.

It is telling that *Adams v. Woods*, which is the lone citation offered by the Court in *Hess* to support the dictum, includes nothing to support Dr. Bauer's argument. Dr. Bauer suggests that the dictum in *Hess* refers to the *Adams* Court's statement that when "the statute which creates the forfeiture

does not prescribe the mode of demanding it[,] either debt or information would lie." 6 U.S. (2 Cranch) at 341. We are not convinced of this statement's relevance. Indeed, *Adams* has nothing to do with whether a private party can pursue a forfeiture action under the Neutrality Act. Rather, *Adams* confronted the question of which causes of action were covered by a statute of limitations that applied to, *inter alia*, "forfeiture." 6 U.S. (2 Cranch) at 336–40. The Court read the statute of limitations to apply to all causes of action normally implied by a forfeiture statute: not only the "informations" specifically mentioned by the statute of limitations, but also "actions of debt" that were not mentioned. The Court's statement merely recognized that when a statute provides for forfeiture, the prosecuting party can normally bring *either* an information or an action of debt – two distinct causes of action at common law.

The Court in *Adams* said nothing about *who* could bring these actions. Indeed, that question was not contested: the statute at issue in the case, the Slave Trade Act of 1794, explicitly authorized a private party to sue. § 2, 1 Stat. at 349. Neither does the Court's statement that forfeiture implies an action of debt compel the conclusion that private parties may pursue forfeiture claims on their own under the Neutrality Act. On this score, the Supreme Court has made it clear that the United States itself can bring a civil action of debt to recover forfeited property. *Stockwell v. United States*, 80 U.S. 531, 542–43 (1871).

Given *Adams*'s lack of support for the dictum in *Hess*, it is unsurprising that courts have criticized and declined to follow the cryptic sentence in footnote 4 in *Hess*. *See, e.g.*, *Jacklovich v. Interlake, Inc.*, 458 F.2d 923, 927 n.10 (7th Cir. 1972); *Conn. Action Now, Inc.*, 457 F.2d at 84–85 & n.5; *Bass Anglers Sportsman's Soc. of Am. v. Scholze Tannery, Inc.*,

329 F. Supp. 339, 344–45 (E.D. Tenn. 1971) (collecting additional cases rejecting the *Hess* dictum); *see also* Diane D. Eames, Comment, *The Refuse Act of 1899: Its Scope and Role in Control of Water Pollution*, 58 CALIF. L. REV. 1444, 1460–61 & n.106 (1970) ("It is not clear that *Hess* correctly interpreted the *Adams* dicta." *Id.* at 1460.). The Supreme Court itself has noted that the sentence in footnote 4 in *Hess* is merely "dictum," *Stevens*, 529 U.S. at 777 n.7, and the Court has never given it effect in any case.

Dr. Bauer also points to some cases for their dicta regarding an informer's right to *seize* a vessel. Apart from the fact that the right to seize is not at issue here, none of the cases cited stands for the proposition that a Neutrality Act informer can prosecute the forfeiture itself. *See Olivier*, 186 F. at 843 (noting that an informer's "seizure" can be disavowed by the government; not recognizing any informer's right to execute forfeiture); *The Venus*, 180 F. 635, 635 (E.D. La. 1910) ("express[ing] no opinion" as to whether an informer can institute an action of seizure); *The City of Mexico*, 28 F. at 148 (governmental seizure); *see also Gelston*, 16 U.S. at 310, 319–20 (discussing the right of an informer "to seize" a vessel, but distinguishing between seizure and forfeiture).

We end where we started: Dr. Bauer has failed to cite a single decision issued by the Supreme Court or any federal appellate court in which a private party has been afforded standing to prosecute either a criminal action or a forfeiture pursuant to the Neutrality Act. In short, there is no good authority to support Dr. Bauer's standing in this case.

**D.** *The History of Enforcement Actions Brought Pursuant to Informer Statutes Does Not Support Dr. Bauer's Standing in This Case*

The foregoing analysis does not precisely focus on bounty or informer statutes, as such, but it nonetheless makes it plain that Dr. Bauer has failed to meet his burden of proving standing in this case. Because the Neutrality Act is an informer statute, we proceed to explain why the history of enforcement actions brought pursuant to such statutes does not support Dr. Bauer's standing here.

As the Supreme Court has noted, the violation of a law such as the Neutrality Act does not injure the informer directly; the violation injures only the Government. *See Stevens*, 529 U.S. at 771–73 (identifying both "the injury to [the Government's] sovereignty arising from violation of its laws . . . and [any] proprietary injury resulting from the" crime). Therefore, it is clear that Dr. Bauer himself was not directly, concretely, and specifically injured by the acts of the Gaza flotilla organizers that he alleged in his complaint. A bounty may give an informer such as Dr. Bauer a "concrete private interest in the outcome of [the] suit," but such an interest is "unrelated to injury in fact [and] insufficient to give [an informer] standing." *Id.* at 772 (first alteration in original) (citations and internal quotation marks omitted). Because Dr. Bauer suffered no injury to a legally protected right from the alleged violation of the law, he does not have personal standing to bring a claim arising from the asserted violation.

There is more to it, however, because the Court in *Stevens* made it clear that an informer in a *qui tam* action may have standing through "the doctrine that the assignee of a claim has standing to assert the injury in fact suffered by the assignor." *Id.* at 773. Thus, in *Stevens*, the Court held that the

False Claims Act "effect[ed] a partial assignment of the Government's damages claim" by granting private plaintiffs the right (subject to government control) to bring a *qui tam* action against those who defrauded the government. *See id.* The assignment in the False Claims Act context is "partial" because the Government retains the right in those cases to intervene and dismiss the claim. "Dismissal ends the assignment." *See Swift v. United States*, 318 F.3d 250, 254 n.* (D.C. Cir. 2003). The controlling question in this case, then, is whether the Neutrality Act is a *qui tam* statute comparable to the False Claims Act and other such statutes. That is, does the Neutrality Act include an assignment of all or a portion of the Government's interest in the statutory bounty sufficient to confer standing on an informer like Dr. Bauer? We hold that it does not.

Since the time of our Nation's founding, Congress has passed numerous informer statutes. As noted above, however, Dr. Bauer has not identified any decision issued by the Supreme Court or a federal appellate court in which a private informer was allowed to pursue forfeiture pursuant to a statute that did not explicitly grant or clearly imply a private cause of action. We can find no such case. Several courts and scholars have extensively surveyed the field and have found near-universal agreement that a statute must clearly indicate a private cause of action, and that language such as that in the Neutrality Act is insufficient. *See, e.g.*, *Conn. Action Now, Inc.*, 457 F.2d at 84 ("All of the past rulings (of which we are aware) upholding a private right to sue turned on language which stated expressly or clearly implied that the informer could begin the proceeding without waiting for governmental action."); *id.* at 84 & n.4 (collecting cases and statutes); *Omaha & R.V.R. Co. v. Hale*, 63 N.W. 849, 850–51 (Neb. 1895) (surveying examples and finding no "serious conflict" on this point); *Drew v. Hilliker*, 56 Vt. 641, 645 (1884)

(discussing typical linguistic formulations that trigger a private cause of action); William H. Rodgers, Jr., *Industrial Water Pollution and the Refuse Act: A Second Chance for Water Quality*, 119 U. PA. L. REV. 761, 787–88 & nn.171–74 (1971) (surveying authorities).

We have found only one, one-hundred-fifty year old, state court decision whose holding appears to support Dr. Bauer's position. *Chi. & Alton R.R. Co. v. Howard*, 38 Ill. 414 (1865). In that case, the Illinois Supreme Court interpreted a state statute with informer language similar to the language in the Neutrality Act, and held that it afforded an informer a right to pursue a *qui tam* action for the recovery of various statutory penalties. Courts and commentators have noted the aberrant nature of the decision, repudiated it, and occasionally even offered theories for how it is consistent with the general rule. Rodgers, *Industrial Water Pollution*, *supra*, at 788 & nn.173–74 (singling *Howard* out as aberrant and repudiated); *Hale*, 63 N.W. at 850–51 (disagreeing with *Howard*); *Conn. Action Now, Inc.*, 457 F.2d at 85 n.6 (characterizing *Howard*'s reasoning as consistent with the general rule). In any event, the decision is neither controlling nor convincing, so it offers no solace to Dr. Bauer here.

## CONCLUSION

For the reasons discussed above, we affirm the judgment of the District Court dismissing the complaint. We do so, however, on the ground that Dr. Bauer lacks standing to pursue his action under the Neutrality Act.

*So ordered.*